### AEOLIAN–SKINNER ORGAN CO. v. SHEPARD BROADCASTING SERVICE, Inc., et al.

No. 3854.

District Court, D. Massachusetts.

Aug 7, 1934.

Roberts, Cushman & Woodberry and Richard F. Walker, all of Boston, Mass., for plaintiff.

Arthur D. Thomson and Howard W. Cole, both of Boston, Mass., for defendant.

BREWSTER, District Judge.

This is an infringement suit involving letters patent of the United States No. 1,596,984, issued to Arthur H. Marks. It is brought by the Aeolian-Skinner Organ Company, Inc., assignee of Marks, against Shepard Broadcasting Service, Inc., the Shepard Company, and the Bay State Broadcasting Corporation. It is agreed that the bill may be dismissed as to the Shepard Company. The defenses are anticipation, noninvention, and noninfringement.

### Statement of Facts.

1. On his application dated March 26, 1923, letters patent No. 1,596,984 were issued to Arthur H. Marks. The claims of the patent cover both method and apparatus, directed to the improvement of broadcasting music, especially organ music. Plaintiff's title to the patent in suit is conceded.

2. The claims involved in this suit are claims Nos. 1 to 5, inclusive, and 8. Claims 1, 2, and 3 relate to a method of broadcasting. The remaining claims relate to broadcasting apparatus. Claim 2 sufficiently illustrates the method claims. It reads as follows:

"2. The method of broadcasting which consists in effecting a primary rendition to be broadcast, synchronously translating the energies thereof through the broadcasting train into a secondary rendition, also substantially synchronously with the primary rendition varying the energies of the broadcasting train to produce primarily a perfect secondary rendition, the while preventing the energies of the primary rendition from reaching the renderer and communicating to him the secondary rendition exclusively."

This claim, when applied to broadcasting organ music, consists of the following steps:

(1) "Effecting a primary rendition to be broadcast." This means the manipulation of the keys and stops of an organ console to vary the acoustical energies of the sound emitted from the organ pipes.

(2) "Synchronously translating the energies thereof through the broadcasting train into a secondary rendition." This means changing the acoustical energies to electrical energies within the microphone and later translating the electrical energies into audible sound through the loudspeaker.

(3) "Also substantially synchronously with the primary rendition varying the energies of the broadcasting train to produce primarily a perfect secondary rendition." These words were inserted in claims substituted for rejected claims. Parties are not in agreement as to what is involved in this step, and it is considered in paragraphs 5 and 6 hereof.

(4) "While preventing the energies of the primary rendition from reaching the renderer and communicating to him the secondary rendition exclusively." This step requires that the performer should hear only the secondary rendition through a sound-proof helmet or through a speaker in a sound proof cabinet.

3. Claim 4 is typical of the apparatus claims and reads as follows:

"4. A broadcasting apparatus comprising a primary sound producing instrumentality, control means for the same, a secondary sound producing instrumentality co-ordinated with the primary one, and means to communicate the secondary sounds to an operator of the control means to the exclusion of the primary sounds."

This claim comprises the following elements when applied to the broadcasting of organ music: (1) The organ pipes; (2) the console, keys, and stops; (3) loudspeaker or head phone co-ordinated with the organ; (4) means to communicate the secondary sounds to an operator of the console to the exclusion of primary sound.

4. Marks was, in 1922, an officer in the Aeolian-Skinner Organ Company. He had had no training or experience in the radio art. He owned a radio and was interested in listening to the broadcasts of organ music and had even considered the advisability of broadcasting a program of music from the Skinner organ. He realized that the rendition of organ music was unsatisfactory, and in the late summer of 1922 he conceived the idea of isolating the performer on the organ from the primary rendition so that he would hear through the loudspeaker what the radio audience was receiving and thereby vary the performance so as to improve the secondary rendition.

Marks' problem, according to his own words, was this: He testified

"I found the organ broadcasts in general very disappointing.

"As the music came from my set it lacked clarity and balance; frequently it varied, within a few seconds' from inaudibility to blasting. * * * I gradually reached a conviction that these things probably were not necessary, not a necessary accompaniment of a radio transmission, and that, therefore, if a method could be devised whereby the organist would know what he was doing and be able to hear approximately what his audience heard, most of these faults might be rectified."

On or about December 11, 1922, he disclosed a plan whereby the performer would hear what was coming from the radio receiver rather than the primary rendition, and by February, 1923, a sound excluding booth and head phones were in use for broadcasting organ recitals. The first trial of the device did not come up to expectations, but by making the exclusion more complete the results were found to be satisfactory, and in March, 1923, Marks applied for the patent.

5. The history of the proceedings in the Patent Office, as revealed in the file wrapper, is important as bearing upon the controversies arising over the scope of the claims involved. The method claims, set forth in the original application, were much broader in scope than those finally allowed. All claims in the application were rejected, whereupon amendments were filed substituting new claims for the first six claims and adding two others. All the claims were again rejected on earlier patents, the references being Ryan, 1,484,087 (1924); Lowenstein et al., 1,522,308 (1925); Hartley, 1,360,740 (1920); Heising, 1,464,097 (1923); Conrad, 1,477,316 (1923). Whereupon the applicant's attorney submitted a communication to the Commissioner of Patents wherein he undertook to differentiate the Marks invention from the earlier patents by pointing out that none of them disclosed the idea of "substantially synchronously with the primary rendition varying the energies of the broadcasting train to produce primarily a perfect secondary rendition," and, further, that Marks was the first one to provide "a positively *sound proof* helmet (not merely a head phone, but a head phone *plus* a device which *absolutely* shuts out extraneous sounds), not to mention a heavy cabinet with absolutely sound proof walls by means of which the same thing can be effected * * *." All through his communication he lays particular stress upon the fact that Marks has improved upon the art by providing a structure or helmet which absolutely and entirely excludes any sound other than the secondary rendition.

In the same communication he also stressed the means shown in the patent for controlling the electrical energies in the broadcasting circuit.

Referring to the examiner's action in rejecting claims on Conrad, Marks' solicitor made the following observation:

"A milliammeter is in no sense a *control* under any technical accepted definition of that word. Controls are devices by means of which the electrical constants of the energy circuits are varied. The milliammeter of Conrad contains no such means for varying the electrical constants. But beyond this, still the claim requires that the controls be *interconnected,* not with the broadcasting circuit (as is the case in Conrad) but with 'the controls of the primary rendering device.' This device is applicant's pipe organ. There is no corresponding element and no substitute for it authorizable by Conrad. * * *

"Even if the milliammeter of Conrad is an indicator, it is in no proper sense, with or without applicant's specification, 'an energy controlling element.' Applicant uses a rheostat, no matter how much energy the milliammeter indicates, or how little it can of itself control."

This rheostat is shown in the drawing as being attached to the console of the organ and to be manipulated by the performer. At the same time amendments to the several claims were made to bring out more clearly the points emphasized in the communication. Thereupon 8 of 12 claims were considered allowable, and the patent issued in due course for these claims.

6. The drawings accompanying the Marks application show in figures 3 and 4 an organ console which carried certain means for varying the energies of the broadcasting train. These elements are numbered 13 and 14 in Figure 3, and 13, 14, and 15 in Figure 4. In the specifications Marks speaks of two controls, one being controls for the primary sound producing instrumentality. Referring to these controls, he states:

"These controls and the controls of the detecting, transmitting and broadcasting apparatuses are associated together for the manipulation by the performer alone or by one or more performers in duet or by a performer and some other person. In the case of permanently correlated or coordinated effects, the control elements thereof in addition to being associated together are actually interconnected or interlocked so that the operation of the controls of the primary sound producing instrumentality to bring about a change in the energy produced thereby will effect also operations of the controls of the detecting, transmitting or broadcasting apparatuses which operations will supplement or augment the effects of the primary controls."

I agree with the defendant's expert that the elements 13 and 14 shown in the drawing "very definitely relate to the control of the electrical energies in the broadcasting system" and that the broadcasting train begins with the microphone rather than at the pipes of the organ. As I read the drawings, specifications, and file wrapper, I am convinced that the invention, both of the method and the apparatus, involves as one of its essential elements means for controlling or varying the energies of the broadcasting train by some device in addition to the organ console.

7. As to the state of the art when Marks entered, the patents to Heising and Lowenstein, above cited, had carried the art to the point of disclosing methods and apparatus for "listening-in" or "monitoring" by tapping in to the broadcasting train, so that the person broadcasting could hear what was going out over the air. For many years prior to 1922, there had been known and used in this country devices adapted for such "listening-in" or "monitoring" purposes. Marks' contribution to the art was to indicate method and apparatus for so isolating the performer that no primary sounds could reach him and to provide for substantially synchronously with the primary rendition varying the energies of the broadcasting train. These two steps and elements were the ones urged upon the patent authorities as patentable novelties, and in view of the state of the art were all that could have been urged.

8. On the question of anticipation, the plaintiff's evidence is not convincing as to the exact date when there was discovery, disclosure, and reduction of the plaintiff's invention. The only record to support the recollection of witnesses is a diary entry made some months after the event, which appears to have been subjected to erasures and with dates superimposed over the original. Without suggesting any attempt to deceive the court, these manifest alterations of the entries impair somewhat the value of these entries as corroborative records.

Considerable evidence was introduced tending to show that a device similar to that

shown in the patent was known and used prior to December 11, 1922. This evidence also fails to show with the requisite degree of certainty the date of such alleged prior use.

I find from the evidence that the methods of listening-in by the performer on an organ had been applied at the studio of the American Radio & Research Corporation at Medford, Mass. (Station WGI), but whether such use was prior to the date of Marks' invention is not shown by clear and convincing evidence.

9. On the question of infringement, the defendants Shepard Broadcasting Service, Inc., and the Bay State Broadcasting Corporation occupy studios in the Buckminster Hotel, in which they have laid out a broadcasting system comprising a studio room, into which organ chambers open by means of shutters and in which is placed a microphone and amplifier. Adjoining this room is another room in which is placed the organ console, and a loudspeaker which is connected with the broadcasting train through the amplifier. The room is not absolutely sound proof. Sounds of the primary rendition are not absolutely excluded, and there are no means attached to the console by which the energies of the broadcasting train may be varied except as they are varied by varying the acoustical energies coming from the organ.

### Conclusions of Law.

If the claims of the patent are given a scope broad enough to cover any method or means of listening-in upon, or monitoring, the broadcast, they clearly read upon the prior art. If, on the other hand, they are given a narrow construction, embracing only the features that can be found to be novel, and patentable if involving invention, then the claims must be limited to two features: (1) The absolute and complete separation of the sounds of the primary and secondary rendition; and (2) methods and apparatus for varying the energies of the broadcasting train, which I have found to mean something more than varying the energies through the ordinary keys and stops of the organ console. It is, in my opinion, necessary to thus limit the claims in view of the file wrapper history. Smith v. Magic City Club, 282 U. S. 784, 51 S. Ct. 291, 75 L. Ed. 707.

In this case, at page 789 of 282 U. S., 51 S. Ct. 291, 293, the court observes:

" * * * that where an applicant for a patent to cover a new combination is compelled by the rejection of his application by the Patent Office to narrow his claim by the introduction of a new element, he cannot after the issue of the patent broaden his claim by dropping the element which he was compelled to include in order to secure his patent. * * * The applicant having limited his claim by amendment and accepted a patent, brings himself within the rules that if the claim to a combination be restricted to specified elements, all must be regarded as material, and that limitations imposed by the inventor, especially such as were introduced into an application after it had been persistently rejected, must be strictly construed against the inventor and looked upon as disclaimers. Sargent v. Hall Safe & Lock Co., 114 U. S. 63, 86, 5 S. Ct. 1021, 29 L. Ed. 67; Shepard v. Carrigan, 116 U. S. 598, 6 S. Ct. 493, 29 L. Ed. 723, supra; Hubbell v. United States, 179 U. S. 85, 21 S. Ct. 24, 45 L. Ed. 95, supra. The patentee is thereafter estopped to claim the benefit of his rejected claim or such a construction of his amended claim as would be equivalent thereto. Morgan Envelope Co. v. Albany Paper Co., 152 U. S. 425, 429, 14 S. Ct. 627, 38 L. Ed. 500."

See, also, Landry Manufacturing Co. v. C. P. Rockwell, Inc. (C. C. A.) 45 F.(2d) 89.

It is obvious, from an examination of the proceedings in the Patent Office, that the *absolute* exclusion of the primary rendition from the operator was emphasized, and the words "substantially synchronously with the primary rendition varying the energies of the broadcasting train" were introduced by amendments to the original claims. These features were urged upon the examiner as patentable novelties differentiating the invention from the prior patents upon which the claims had been previously rejected. Moreover, it was not invention to apply to broadcasting of organ music well-known principles or means of listening-in by tapping-in on the broadcasting circuit. Such steps were not novel, nor did they involve exercise of inventive faculty.

To a combination of steps and of elements, all old in the art, Marks added steps and elements which may well entitle him to the patent. To an extent he advanced the art, especially in its application to the broadcasting of organ music. If the invention contemplated only varying the acoustical energies through the manipulation of keys and stops ordinarily found in an organ console, it was not invention to add this means of

varying the energies of the broadcasting train. It is only by ascribing to these features the meaning for which the defendants contend that the patent can be supported as valid.

The patent being thus limited to these two features, namely, the *absolute* exclusion of primary rendition and the device for varying the electrical energies in the broadcasting train, the defendants do not infringe inasmuch as in their studio, and in the broadcasting system which they have set up therein, neither of these elements or steps is utilized.

I conclude that the claims of the patent in suit are valid but not infringed.

Plaintiff's bill, therefore, must be dismissed.